**CAESARS WORLD, INC. and Park Place Entertainment Corporation, Plaintiffs,**

v.

**Cyrus MILANIAN and the New Las Vegas Development Company, LLC, Defendants.**

**No. CV–S–02–1287–RLH RJJ.**

United States District Court, D. Nevada.

Feb. 19, 2003.

---

Pitney, Hardin, Kipp & Szuch, by Stephen W. Feingold, Richard H. Brown, New York, NY, for the Plaintiffs.

Melvin K. Silverman, Ft. Lauderdale, FL, Andras F. Babero, Law Office of Andras Babero, Las Vegas, NV, C. Hunterton, Hunterton & Associates, Las Vegas, NV, Gregory Buhyoff, Law Office of Gregory F. Buhyoff, Las Vegas, NV, Samuel

Benham, Hunterton & Associates, Las Vegas, NV, for the Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

HUNT, District Judge.

This matter having come on for trial before the bench on January 21–23, 2003, and the Court having heard the testimony of witnesses and received evidence, the Court makes the following Findings of Fact, and Conclusions of Law, and enters Judgment thereon as follows:

### FINDINGS OF FACT

#### A. *The Parties*

1. Plaintiff Caesars World, Inc. ("CWI") is a Florida corporation, with its principal place of business at 3930 Howard Hughes Parkway, Las Vegas, Nevada 89109.

2. Plaintiff Park Place Entertainment Corporation ("PPE") is a Delaware corporation, with its principal place of business at 3930 Howard Hughes Parkway, Las Vegas, Nevada 89109. CWI is a wholly owned subsidiary of PPE.

3. Defendant Cyrus Milanian is an individual domiciled in New Jersey who transacts business in the State of Nevada.

4. Defendant The New Las Vegas Development Company, LLC, is a Nevada limited liability corporation.

#### B. *Plaintiffs Claims For Relief*

5. Plaintiffs' initial complaint included five causes of action. Count One seeks declaratory judgment that Plaintiffs are not infringing any rights of Defendants by virtue of their use of the mark COLOSSEUM for a new entertainment venue at Caesars Palace in Las Vegas.

6. Count Two alleges that Defendants are infringing Plaintiffs' rights in their COLOSSEUM common law trademark in violation of the Lanham Act.

7. Count Three alleges that Defendants are infringing Plaintiffs' rights in their COLOSSEUM common law trademark in violation of the Nevada law.

8. Count Four alleges that Defendants are violating Plaintiffs' rights in their EMPIRE family of marks, in violation of the Lanham Act.

9. Count Five alleges that Defendants are violating Plaintiffs' rights in their EMPIRE family of marks, in violation of Nevada law.

10. At the conclusion of Plaintiffs' case the Court granted Plaintiffs' motion to amend the Complaint to conform to the evidence under Rule 15(b) of the Federal Rules of Civil Procedure. (Tr. 473–474). Plaintiffs are filing an Amended Complaint, which adds Count Six seeking a declaratory judgment that Plaintiffs have not violated any claims Defendant Milanian may have either for breach of contract, theft of trade secret, misappropriation or conversion, based on Milanian's purported 1996 proposal to CWI with respect to the construction at Caesars Palace of a replica of the ancient Roman Coliseum. While the Amended Complaint still includes the claims against NLVD (Counts 1–5), NLVD has been dismissed from this action.

#### C. *The Plaintiffs*

11. PPE is the world's largest gaming company owning, managing or having an interest in 27 properties operating under various trademarks including the famous CAESARS, BALLY'S, GRAND CASINO, PARIS, and FLAMINGO brands. (Tr. 49). In 1999, PPE acquired CWI in a transaction that included Caesars Palace, located in Las Vegas, Nevada, CWI's trademarks, and other CWI assets. (Tr. 51). In addition to gaming services, both PPE and CWI provide hotel and restaurant services, convention facilities and ser-

vices, sporting events, concerts, and other entertainment to the public. (Tr. 66).

12. Plaintiffs' premiere property is Caesars Palace in Las Vegas, Nevada, which opened on August 6, 1966. (Tr. 49, 51). Caesars Palace has an opulent Roman–Grecian theme, with marble statuary, and stylized designs that reflect the theme, and facilities that bear the names associated with ancient Rome and Greece. (Tr. 51).

13. CWI is the owner of several marks registered with the United States Patent and Trademark Office ("USPTO"), relating to this Roman–Grecian theme, including, but not limited to: CAESARS (Reg. No. 0954684–incontestable (Ex. 463–K); Reg. No. 0983525–incontestable (Ex. 463–N); Reg. No. 1527770–incontestable (Ex. 463–AL); Reg. No. 1988107–incontestable (Ex. 463–BB)), CAESARS (stylized) (Reg. No. 1001363–incontestable (Ex. 463–O); Reg. No. 0954637–incontestable (Ex. 463–AC); Reg. No. 1527771–incontestable (Ex. 463–AM)), CAESARS PALACE (Reg. No. 0907693–incontestable (Ex. 463–A), Reg. No. 0951262–incontestable (463–T); Reg. No. 0963820–incontestable (Ex. 463–R); Reg. No. 0963656–incontestable (Ex. 463–U); Reg. No. 1091551–incontestable (Ex. 463–AR)), CAESARS PALACE (stylized) (Reg. No. 0907696–incontestable (Ex. 463–D); Reg. No. 0968212–incontestable (Ex. 463–V); Reg. No. 1090494–incontestable (Ex. 463–F); Reg. No. 1004058–incontestable (Ex. 463–S); Reg. No. 1158035–incontestable (Ex. 463–AG)), I, CAESAR (Reg. No. 0907694–incontestable (Ex. 463–B); Reg. No. 0966734–incontestable (Ex. 463–W)), CIRCUS MAXIMUS (Reg. No. 0965251–incontestable (Ex. 463–E)), THE PALACE (Reg. No. 1096310—incontestable (Ex. 463–G); Reg. No. 1128428–incontestable (Ex. 463–M)), A CAESARS WORLD RESORT (Reg. No. 1063525—incontestable (Ex. 463–H)), Roman Edging Paper Design (Reg. No. 0947706–incontestable (Ex. 463–I); Reg. No. 1194868–incontestable (Ex. 463–AJ)), CAESARS WORLD (Reg. No. 0995419–incontestable (Ex. 463–Y)), CAESARS WORLD (stylized) (Reg. No. 0995418–incontestable (Ex. 463–X)), THE PALACE COURT (Reg. No. 1128000–incontestable (Ex. 463–AD)), CLEOPATRA'S BARGE (Reg. No. 0979106–incontestable (Ex. 463–P); Reg. No. 1138113–incontestable (Ex. 463–AF)), SPANISH STEPS (Reg. No. 1146922–incontestable (Ex. 463–AH)), CAESARS TAHOE (Reg. No. 1263220–incontestable (Ex. 463–AK); Reg. No. 1191413–incontestable (Ex. 463–AW)), CAESARS TAHOE (stylized) (Reg. No. 1186958–incontestable (Ex. 463–AU); Reg. No. 1201555–incontestable (Ex. 463–AV); Reg. No. 1201511–incontestable (Ex. 463–AX)), CAESARS WOMAN (Reg. No. 1532553–incontestable (Ex. 463–AQ)), CAESARS WOMAN (stylized) (Reg. No. 1531548—incontestable (Ex. 463–AN)), CAESARS MAN (Reg. No. 1531549—incontestable (Ex. 463–AO)), CAESARS MAN (stylized) (Reg. No. 1538771—incontestable (Ex. 463–AP)), CAESARS PALACE LAS VEGAS—NEVADA with Grape Girl Design (Reg. No. 1168663—incontestable (Ex. 463–AS)), TOGA TEDDY (Reg. No. 1676542—incontestable (Ex. 463–AT)), CAESARS MAGICAL EMPIRE (Reg. No. 2630525 (Ex. 463–AY)), EMPERORS CLUB (Reg. No. 1743663—incontestable (Ex. 463–AZ)), FERENTINA (Reg. No. 2022361—incontestable (Ex. 463–BA)), EMPERORS EVERYDAY GIVEAWAY (Reg. No. 1837096—incontestable (Ex. 463–BC)), THE FORUM SHOPS AT CAESARS (Reg. No. 1829004—incontestable (Ex. 463–BD)) LA PIAZZA (Reg. No. 1649800—incontestable (Ex. 463–BE)), and CAESARS PALACE AT SEA (Reg. No. 1663829—incontestable (Ex. 463–BF)), Grape Girl Design (Reg. No. 0884317—incontestable (Ex. 463–C)), PALACE RE-

SERVE (Reg. No. 1644190–incontestable (Ex. 463–AB)).

14. These registered trademarks are used in interstate commerce, are valid and all but one, CAESARS MAGICAL EMPIRE, is incontestable. (Tr. 264). Because of CWI's outstanding reputation in the hospitality industry and the millions of dollars dedicated to its promotion, the CAESARS name is among the most famous in the industry and is world-renowned. (Tr. 119).

### D. *CWI's COLOSSEUM Mark*

15. When it opened in August 1966, CAESARS PALACE included 680 guest rooms, a 980–seat showroom branded as CIRCUS MAXIMUS, a GARDEN OF THE GODS pool-spa complex, and a 35,-000 square foot convention center called THE COLOSSEUM Convention Complex. (Tr. 51). Newspaper articles describing the opening of CAESARS PALACE property included references to THE COLOSSEUM convention center. (Tr. 54). At the time of the opening, Caesars Palace produced and distributed brochures and press releases that identified THE COLOSSEUM convention center. The materials use the same stylistic devices to distinguish THE COLOSSEUM (e.g. Italics or all caps) as used to distinguish designations such as CAESARS PALACE or CIRCUS MAXIMUS that would become federally registered. (Tr. 60–61, 73–74, Ex. 124, 126). Those brochures and press releases were circulated in interstate commerce. This COLOSSEUM convention center in no way resembled the ancient Roman Coliseum. It did not have elevated seating and was rectangular in shape. (Tr. 51–53; Ex. 115)

16. THE COLOSSEUM has been used to designate many different services offered in relation to the convention center at Caesars Palace. (Ex. 124). Based on the testimony and exhibits admitted at trial, it is clear that these services include entertainment services such as headliner acts, televised events, live boxing and other sports events. (Tr. 99–103). THE COLOSSEUM was also used in connection with casino and gaming services such as annual slot tournaments and sports betting services. (Tr. 98–101, 105–108, Ex. 118, 442–M, 442–N, 442–L).

17. For instance, Exhibit 121 and 122 are examples of a ticket and invitation sent to select people on CWI's mailing list promoting its Super Bowl party. Such Super Bowl parties were held, with perhaps one or two exceptions, each year in THE COLOSSEUM facility and featured gaming services. (Tr. 98–100, Ex. 121, 122). In order to comply with Nevada State gaming regulations, one portion of THE COLOSSEUM facility was specially remodeled to include overhead cameras and other security to comply with Nevada gaming regulations. (Tr. 98). THE COLOSSEUM brand was also used in connection with food and banquet services. (Tr. 96–102, Tr. 104–108 Ex. 121, 122, 442–A, 118, 442–L, 442–M, 442–N). Since August of 2001, Plaintiffs have also offered for sale coffee mugs, bar soap and candles in various sizes bearing THE COLOSSEUM mark.. (Tr. 121–122, Ex. 442–O).

18. Since the opening of Caesars Palace in April of 1966, it is estimated that at least 10,500,000 people have enjoyed some service offered under THE COLOSSEUM trademark at Caesars Palace. (Tr. 117).

19. Caesars Palace has received multiple awards for the convention services offered under THE COLOSSEUM mark. For instance, *Meeting & Conventions Magazine* awarded Caesars Palace the Gold Key Award for its hotel and convention services. This is an annual award given to the finest meeting properties worldwide, with winners nominated and chosen by Meetings & Conventions corpo-

rate, incentive and association meeting planner subscribers. *Meetings in the West* voted Caesars Palace one of the top 50 properties in the West for meetings based on a readers survey. Caesars Palace was also awarded the 2000 Award of Excellence for its services for corporate meetings and incentive travel by subscribers to *Corporate & Incentive Travel Magazine*. (Tr. 117–121). The advertisements placed by CWI heralding these accomplishments included prominent references to THE COLOSSEUM mark. (Tr. 117–118, Ex. 113, 137).

20. Since the opening in 1966 CWI has spent many millions of dollars promoting CAESARS PALACE. Deborah Munch, Vice President of Public Relations, testified that because THE COLOSSEUM mark is usually used in combination with CAESARS PALACE or another version of the CAESARS mark, it is difficult for CWI to provide an exact estimate of the amount of monies expended promoting THE COLOSSEUM mark. (Tr. 132). Based on reliable estimates, the Court finds that CWI expended at least some amount over $19 million in promoting THE COLOSSEUM mark since the opening of CAESARS PALACE in 1966 until 2000. (Tr. 133).

21. The showroom at the Caesars Indiana gaming vessel bears the name COLOSSEUM. It in no way resembles the ancient Roman Coliseum. Like the COLOSSEUM Convention Center at Caesars Palace, it is rectangular in shape and does not have elevated seating. (Tr. 123). When CWI opened that showroom in November 2000, it issued promotional materials for the entertainment services offered in THE COLOSSEUM showroom in interstate commerce, and the opening was reported in the press. (Tr. 125–127, Ex. 132, 133, 134, 135, 136).

22. CWI also established a series of four hotels in Pennsylvania known as the Caesars Pocono Resorts. The main restaurant at Cove Haven, one of the 4 resorts constituting Caesars Poconos, was and is called THE COLOSSEUM. (Tr. 128–129). When PPE acquired CWI in 1999, it did not acquire Caesars Poconos. However, as part of the transaction, CWI has licensed the buyer to use certain trademarks, including the CAESARS and COLOSSEUM marks. (Tr. 128). THE COLOSSEUM dining room at Caesars Poconos has an exterior whose high arches and columns resemble the original Coliseum amphitheatre from the ancient Roman Empire. (Ex. 151). The dining room is advertised on the Internet as THE COLOSSEUM dining room. (Tr. 130, Ex. 131). Ms. Munch testified that the licensee reports that from the opening in approximately 1980 until 1999, over $50 million has been spent in promoting Cove Haven, including the restaurant services offered under THE COLOSSEUM mark. Ms. Munch also testified, based on information provided to her in the normal course of business, the Caesars Poconos resort has served more than 1,000,000 customers in THE COLOSSEUM dining room since its opening. (Tr. 128–132). The Court credits this testimony, which was not rebutted in any way.

23. As a result of the thousands of people who have utilized the various services offered at the convention center in Las Vegas under THE COLOSSEUM trademark, eaten at THE COLOSSEUM dining room in Pennsylvania, attended a performance at THE COLOSSEUM showroom in Indiana, purchased merchandise sold in connection with THE COLOSSEUM trademark, and the extensive promotion by CWI of THE COLOSSEUM mark in connection with the services referenced above, the Court finds there is considerable association by the public of COLOSSEUM with CWI, and Caesars Palace in particular.

24. The strength of THE COLOSSEUM mark is also reflected by the extensive use by third parties of THE COLOSSEUM mark in association with CWI. Since 1981, THE COLOSSEUM has been referred to in association with CAESARS properties in numerous articles in news journals nationally and internationally. (Tr. 328–334, Ex. 181–186, Ex. 188–276, Ex. 280, 288, 299–320, 326–334, 337–357, 360–416, 418–419).

### E. *CWI's EMPIRE Family of Marks*

25. CWI has used several marks with respect to their properties that incorporate the EMPIRE mark. The marks EMPIRE (Ex. 441–AU), and THE ROMAN EMPIRE (441–X), (together with other marks identified below, the "EMPIRE Family of Marks") have been used synonymously with CAESARS PALACE and the services offered there from since at least 1968, as evidenced by a wide variety of promotional materials.

26. Since at least the early 1990's, the EMPIRE and ROMAN EMPIRE marks have been used on maps of the Caesars property entitled "GUIDE TO THE EMPIRE." (Tr. 64–66, Ex. 114, 441–E, 441–D). The EMPIRE mark has also been used in promotional materials in numerous ways including ONWARD TO THE EMPIRE (Ex. 125), EXPERIENCE AN EMPIRE (Ex. 441–AJ), and BEHOLD THE EMPIRE (Ex. 441–P). Until recently, Caesars Palace offered special entertainment at CAESARS MAGICAL EMPIRE (Ex. 463–AY). As a large public facility, Caesars Palace is constantly renovating, modifying, or simply maintaining its physical structure. Whenever this occurs, CWI—as does virtually every public facility—places a sign apologizing for any inconvenience. However, CWI customizes these notices to fall within its Roman–Grecian theme and headlines these notices with the trademarks REBUILDING AN EMPIRE (Ex. 441–Y) or THE EMPIRE EXPANDS (Ex. 441–AM, 441–AL). For the past three years, a neon sign reading WELCOME TO THE EMPIRE hangs above an entrance at Caesars Palace. (Tr. 141–142, Ex. 441–AX). CWI has also used the mark THE JEWEL OF THE EMPIRE to distinguish Caesars Palace from its other Caesars properties. (Tr. 67–68, 124, 134).

27. CWI uses the EMPIRE Family of Marks at its other Caesars facilities. Caesars Indiana distinguishes itself from its sister properties as THE GLORY OF THE EMPIRE (Tr. 124), inviting people to EXPERIENCE AN EMPIRE (Ex. 441–AJ) and watch THE EMPIRE'S TOUGHEST GLADIATORS (Ex. 441–AO, 441–AP). CAESARS ATLANTIC CITY offers guests a guide to RESTAURANTS OF THE EMPIRE, as well as pamphlets, which say WELCOME TO THE EMPIRE CAESARS ATLANTIC CITY (Tr. 67, Ex. 441–E). Caesars Tahoe identifies itself within the group of Caesars properties as the MOUNTAIN EMPIRE (Tr. 134).

28. CWI is also the owner of three additional relevant registrations namely CAESARS MAGICAL EMPIRE (Registration No. 2,630525) (Ex. 463–AY), the EMPERORS CLUB (Registration No. 1,743663) (Ex. 463–AZ), and EMPERORS EVERYDAY GIVEAWAY (Registration No. 1,837096) (Ex. 463–BC).

29. The foregoing demonstrates Plaintiffs' use of the EMPIRE Family of Marks dates back to at least 1968, and that the amount Plaintiffs have invested in using and promoting the EMPIRE Family of Marks in interstate commerce is a multiple of the substantial amounts expended on behalf of THE COLOSSEUM mark. (Tr. 134–149, Ex. 441–A & B, 441D–F, 441–K–M, 441–P, 441–X & Y, 441–AE, 441–AI—AS, 441–AU & AV, 441–AX)

### F. *Plaintiffs' Decision to Build a New Entertainment Center in Las Vegas.*

30. In the 1990s, CWI began to face serious competition as the industry leader in Las Vegas as properties such as the Venetian, Bellagio and Mandalay Bay opened. (Tr. 149). All these new properties were targeting the same customers that Caesars Palace had developed over its many years. (Tr. 149–150). In order to maintain the prestigious reputation of CAESARS in Las Vegas and solidify the perception of PPE as the premiere gaming company in the world, PPE (which by then owned CWI) decided to build a new entertainment complex at CAESARS PALACE. (Tr. 150).

31. PPE and CWI were already in discussions at this time with Celine Dion, the well-known Canadian singer, concerning the creation of a new production in which she would star. (Tr. 151). Ms. Dion and her husband/manager (Rene Angelil) had already begun discussions with Sceno Plus, a Canadian firm specializing in designing and building unique venues. (Tr. 386).

32. PPE and CWI, together with Ms. Dion and Mr. Angelil, described the requirement of this space for the type of show that was contemplated as well as the site within the Caesars Palace property where this venue would be constructed. (Tr. 386–387).

33. Sceno Plus took this information and using its own creative talents developed a place for a building that would fit within the existing Roman–Grecian theme permeating Caesars Palace. (Tr. 385–396, Ex. 475, 476, 477).

34. It was Sceno Plus that developed the idea of constructing a building resembling the ancient Roman Coliseum and suggested naming it COLISEUM, and then presented the idea to PPE. Sceno Plus's concept has a large circular shape with columns and arches mimicking the inside of the ancient Roman Coliseum.

The stage has been built to have lifts from under the stage to bring up sets and performers the same way that there were lifts in the ancient Roman Coliseum to bring animals and gladiators to the center stage. However, the audience will not totally encircle the stage as it did at the ancient Roman Coliseum. (Tr. 391–396, Ex. 476, 477).

35. PPE and CWI approved the selection of the name (with a modified spelling to dovetail the spelling used for THE COLOSSEUM convention complex at Caesars Palace) because the name was consistent with the well-known Roman–Grecian theme associated with CWI. (Tr. 398–399).

36. Plaintiffs closed the original COLOSSEUM convention center in August of 2000. (Tr. 177). On April 10, 2001, PPE publicly announced plans to build a new 4,000 seat theater connected to, and incorporated within, CAESARS PALACE, also to be called THE COLOSSEUM AT CAESARS PALACE, but which will from time to time be referred to only as COLOSSEUM. (hereinafter, "THE COLOSSEUM") (Tr. 150–151, Ex. 37).

37. THE COLOSSEUM is located at the apex of Las Vegas and Flamingo Boulevards, where it can be seen from virtually anywhere on the Las Vegas Strip, and is positioned prominently in front of CAESARS PALACE. The decision to build such a prominent building is part of PPE's strategic competitive response to the "New Las Vegas." (Tr. 387–391). THE COLOSSEUM mark was also prominently featured on the actual construction site at Caesars Palace. For instance, one of the signs stated "Battles Raged There. Chariots Roared There. Beasts Ravaged There. (And Now Celine Will Play There.) COLOSSEUM. The World's First Stage. Coming Soon To The Empire." (Tr. 240, Ex. 28).

38. Construction began shortly after the April 2001 announcement. PPE expects the facility will cost approximately $95 million to construct. (Tr. 239). On May 22, 2002, PPE gave details of the premiere engagement at THE COLOSSEUM, announcing that Celine Dion will be appearing 200 nights a year in a Franco Dragone production for the next three years. The announcement stated that THE COLOSSEUM would open in March 2003. (Tr. 152, Ex. 68).

39. As part of the May 22, 2002 announcement, Celine Dion appeared at THE COLOSSEUM with the construction crew, an event that attracted significant nationwide media coverage in both print and televised media. (Tr. 153).

40. THE COLOSSEUM mark will not only be used to designate the entertainment services offered by Plaintiffs as the new performance home for Celine Dion, it will also be used to designate numerous other services, including T.V. specials, boxing events, concerts, conventions, and parties for special occasions like the Super Bowl. (Tr. 184). In addition to the goods noted above, after the May 22nd announcement CWI commenced use of THE COLOSSEUM at Caesars Palace mark on t-shirts and anticipates expanding the goods to be branded with this mark. (Ex. 34).

41. PPE and CWI have already spent $2 million in marketing and promoting THE COLOSSEUM AT CAESARS PALACE and the services to be offered in connection therewith. (Tr. 159). These promotion efforts include pop-up advertisements on the Caesars web site and advertisements in the print media. (Tr. 155, Ex. 27). In her testimony, Ms. Munch reliably estimated that over 1,000,-000 visitors have accessed the Caesars web site since it began THE COLOSSEUM promotions. (Tr. 155–156). In all, PPE has spent or committed to spend $4 million in promoting the new COLOSSEUM. (Tr. 156).

42. If PPE and CWI are prevented from using THE COLOSSEUM mark, they would suffer financially and through loss of goodwill. Ms. Munch testified that the cost to PPE and CWI in having to redo the signs, the tickets, and all of CWI's promotional material would be very significant. (Tr. 159) In addition, PPE and CWI could not recapture the favorable media exposure already obtained if they could not use this mark. (Tr. 159–160; 335–36).

43. If they cannot use THE COLOSSEUM mark, Plaintiffs also stand to lose considerable goodwill with: (a) customers and others in the public who associate THE COLOSSEUM mark with CWI in general, and Caesars Palace in particular including the services to be offered at the new entertainment complex; and (b) their business partners involved in the March 2003 opening at THE COLOSSEUM and who have promoted the entertainment services to be offered at this new facility under THE COLOSSEUM mark. (Tr. 160; 335–36)

## G. *Cyrus Milanian's Business and His Claim of Trademark Rights.*

44. As explained below, Milanian was barred from testifying for refusing to appear at his deposition. Therefore there is little evidence about his background. A self-described "Internettor," the only business connected to him operates under his personal name and purports to offer telephone and ISP services. (Tr. 291–292, Ex. 7). Milanian owns at least one domain name, jimcrow.com, that has been offered for sale. (Tr. 293–295, Ex. 1, 4). There is no evidence that Milanian has any meaningful experience in the casino or resort hotel business. Indeed, according to a Dun & Bradstreet report, on May 26, 2002,

Milanian told an interviewer that he operated a telephone communications company under his personal name. (Ex. 7) Thus, it appears that as of May 26, 2002, only days before he contacted Plaintiffs for the first time, that Milanian did not describe himself as a consultant for the hotel or casino industry. (Ex. 7). He does have considerable experience in filing trademark applications, having filed approximately 156 of them since 1998. (Tr. 295–296, Ex. 153).

45. Based on the testimony offered by Plaintiffs, the Court finds that Milanian's business model is to apply for a series of trademarks for a particular theme that he anticipates (or expects) will be a theme for a casino or resort hotel. The vast majority of these applications have been filed on an intent-to-use basis. (Tr. 296).

46. For example, Milanian applied for numerous trademarks relating to a Titanic themed casino and a casino themed after the city of San Francisco. (Ex. 153). Significantly, Milanian did not claim an intent to use these marks in connection with casino or hotel services, but rather in connection with "Business Management of Resorts Hotels [sic], Casinos and Theme Parks for Others and Products Merchandising [sic] Services." (*E.g.*, Ex. 170).

47. The Court finds that this description of services was an intentional misrepresentation and that, in fact, these trademarks were filed for the purpose of assigning them to casinos and hotels for those businesses to use in connection with their services. For instance, on one website, a printout of which was submitted by Milanian in connection with his Statement of Use[1] to substantiate his use of the mark "The New Las Vegas" for "Business management of resort hotels, casinos and theme parks for others in International Class 25; Product merchan-

dising in International Class 35; and Real estate development, in International Class 37," he stated quite clearly that:

> "Cyrus Milanian offers for sale and or rent/lease in the United States of America and/or Global marketplace, and/or internet; *license rights and/or buyout rights* for goods and services advertising for sale or rent/lease in exchange for royalties/compensationary for the following trademarks, servicemarks." (Ex. 163, emphasis added).

48. The examiner found that this specimen was unacceptable because it did "... *not show use of the service mark in relation to the identified service.*" Subsequently, Milanian amended the language. Six months later, the same web-site, submitted as a specimen for a different mark, stated:

> Cyrus Milanian offers for a fee his services, namely, business management of resort hotels, casinos and theme parks for others and merchandising services for others internationally, and/or in the United States of America, under one or more of the following trademark/service marks mentioned under its own title. (Ex. 159).

49. The Court finds this change in the wording of his website an example of Milanian's bad faith intent in attempting to register marks, for which he has neither trademark usage nor a bona fide intent to use.

50. There is other evidence that Milanian's claim of intended use of consulting services was a sham. Milanian owns patents relating to the creation of a Titanic-themed resort and casino. For instance, patent number 6,073,403 includes the following statement:

---

1. A Statement of Use is filed in an intent-to-use application to demonstrate that the Mark is actually in use. A certificate of registration

will only issue for an intent to use application after a Statement of Use is filed and accepted.

"A fully integrated building complex comprising a body of water, a first *housing structured* to resemble the Titanic and a generally domed-shaped second *housing structured* to resemble an iceberg. The first and second housings are each situated within the body of water, resting on the bottom thereof, and a second portion is disposed above the body of water. The interior of the first and second housing are divided into a plurality of levels and may include an entranceway/lobby, *guest quarters, restaurant and entertainment facilities, a casino and other hotel amenities,* such as health clubs, swimming pools, beauty salons, retail shops, etc. Access between the first housing and the shore is provided by a generally tubular-shaped enclosed gangway having at least one conveyor belt-like people mover. Access between the second housing and the shore is provided by a generally tubular-shaped enclosure having one or more motorized or tram-like vehicles operating therein. Access between the first and second housings is provided by a generally tubular-shaped tunnel having one or more motorized or tram-like vehicles operating therein." (Defs. Ex. O, emphases added).

51. The Court finds that the filing of this and other patents (Defs. Ex. L, M) indicates that Milanian had developed a concept for what he believed to be an innovative business method. It strains credibility to believe that Milanian was intending to offer consulting services under numerous Titanic-themed trademarks at the same time that he had invested in the registration of three patents relating to the operation of a Titanic-themed resort. The statements on his website clearly evidence that these Titanic trademarks were intended to be part of the "package" sold or licensed to an interested company with the ability to implement the patent claims under the related trademarks. In-

deed, Milanian's counsel implicitly conceded this connection when he asked Plaintiff's Vice President of Corporate Law, Mark Clayton, "... it [isn't] reasonable to you that someone who had invented and obtained patents on a complex that could take the form of a replica of the Titanic would want to apply for trademarks to try to protect that concept further?" (Tr. 366).

52. Milanian's pattern of bad faith is further evident by the fact that, with respect to Titanic-themed marks, Milanian filed his first application six weeks after being told by Cunard that it was not interested in licensing its trademarks. *See Cunard Line Limited v. Cyrus Milanian,* Opp. No. 116,277 (T.T.A.B. July 28, 1998). (Ex. 5). To quote the T.T.A.B.:

A final comment is in order. It has not gone without notice that applicant filed the involved application some six weeks after receipt of the letter advising him that opposer was not inclined to license or lease any of its trademarks. Opposer contends that is was not even aware from the business plan and the parties' discussions that applicant desired to use and register this mark. Of course, applicant contends otherwise. However, if, as applicant maintains, opposer knew that applicant desired to use an register the flag design mark, the June 1, 1998 letter from opposer should have at least raised a question in applicant's mind as to whether the flag design mark was one of the trademarks opposer was not inclined to license or lease. Stated differently, there should have been a question in applicant's mind as to whether opposer was claiming rights in the flag design mark. (Ex. 5).

53. As indicated above, Milanian's applications are filed on an intent-to-use basis, which requires a good faith bona fide intent to use the marks in connection with

the sale of goods or services. The Court finds that Milanian deliberately misstated the claimed services as consulting because he knew there was no way he would ever be able to show proof of use in connection with an actual hotel or casino. On the other hand, it appears that Milanian believed he could prove use of the marks in consulting services by creating a website offering these services and displaying the marks on the website.

54. When the trademark office refused to accept the website quoted above as evidence of use for consulting services, (see Ex. 163), Milanian modified the website. There were subsequent revisions, presumably to address other issues raised by the various Examining Attorneys at the U.S. Patent and Trademark Office. For instance, the website resortscenter.com now reads:

> Cyrus Milanian offers for a fee his services, namely, business management of resort hotels, casinos and theme parks for others and merchandising services for others internationally, and/or in the United States of America, under one or more of the following trademark/service marks mentioned under its own title. Cyrus Milanian also offers for a fee to consult on business management of resort hotels, casinos, and theme parks and product merchandising services for others under one or more of the following trademarks mentioned under its own title. (Ex. 485)

55. The web site then lists over a hundred trademarks, including the ones for which he is attempting to show use. (Ex. 485).

56. Milanian's business model has not been successful. There is no evidence that he has generated any sales of his business management services offered through his web sites. Indeed, Milanian's approach— filing for many related trademarks for a theme for a prospective casino or resort hotel and then offering "business management services" under those trademarks— is inconsistent with the approach used by experienced developers or consultants who provide services in connection with a new resort hotel or casino.

57. Donald Chandler, PPE's Vice President of Architecture and Design, testified that he worked with several consulting companies with respect to PPE's casino business. Indeed, prior to being employed by PPE, Mr. Chandler has experience offering consulting services (Tr. 231). Mr. Chandler testified that he was not aware of any company that offered pre-registered trademarks as part of its services. (Tr. 241–245).

58. No evidence refutes this testimony. Thus, this Court finds on the credible testimony and evidence presented at trial that the accepted and standard industry practice is to provide consulting or management under the firm's own name, not under one or many trademarks that would be used by the consultant's clients in its business.

## H. *Milanian's Claim of Trademark Rights in COLOSSEUM and EMPIRE*

59. On April 23, 2001, less than two weeks after PPE announced the imminent commencement of construction of a new 4,000 seat showroom to be called THE COLOSSEUM, Milanian filed an intent to use application with the USPTO (Serial No. 78/059,830) for THE COLOSSEUM, for "business management of resort hotel, casinos, and theme parks for others and product merchandising services." (Ex. 154).

60. Based on Milanian's efforts, however unsuccessful, to market his services to hotels and casinos such as those operated by PPE and CWI, as well as the timing of this filing, the Court finds that at the time

Milanian filed this application he had knowledge of Plaintiffs' use of its COLOSSEUM marks and their intent to use COLOSSEUM in connection with the services to be offered at the new entertainment complex. The Court also finds that Milanian knew that the use of THE COLOSSEUM mark for these services would also inevitably lead to the use of the mark on merchandise such as souvenirs and related goods including slot machines.

61. On August 21, 2001, Milanian filed another intent to use application with the USPTO (Serial No. 76/302,255) for ROME LAS VEGAS COLOSSEUM, for "resort hotels, casinos, and theme park business management, development, and product merchandising services." (Ex. 157). Notwithstanding these filings, Milanian took no steps to contact Plaintiffs. The Court concludes that this failure to contact Plaintiffs was not accidental, but was intentional. Milanian's pattern of conduct and obvious interest in assigning his rights to Plaintiffs support the conclusion that Milanian believed that the longer he waited to contact Plaintiffs, the more time and money Plaintiffs would expend in the mark thereby raising the value to any claim made by Milanian.

62. On April 18, 2001, Milanian filed an intent to use application for THE EMPIRE mark (Serial No. 78/059,056) for "business management of resort hotels, casinos and theme parks for others and products merchandising services." (Ex. 159). Thereafter, on October 21, 2001, Milanian filed an intent to use application for THE ROMAN EMPIRE mark (Serial No. 78/090,495) for "business management and development or casinos, hotel resorts, restaurants, shopping malls, convention centers, theme parks, real estate, and product merchandising." (Ex. 156).

63. As noted above, Plaintiffs own the EMPIRE Family of Marks. Milanian's applications for the Empire marks, for which Plaintiffs had not obtained federal registrations but held strong common law rights, appears to have been part of an effort to increase the value of any settlement to Milanian. Indeed, while subsequently withdrawn, on October 27, 2001, Milanian filed an intent to use application (Serial No. 78/090,499) for JULIUS CAESAR for "business management and development of casinos, hotel resorts, restaurants, shopping malls, convention centers, theme parks, and products merchandising services." Outside trademark counsel for Park Place Entertainment wrote a cease and desist letter to Milanian on May 3, 2002. (Tr. 316–317, Ex. 469). Milanian later abandoned the application. (Tr. 317). Nevertheless, the timing of this application together with the other EMPIRE and COLOSSEUM applications supports the Court's finding that Milanian was purposefully seeking to obtain as much leverage as possible in the negotiations he would shortly commence. The Court also finds that this pattern of conduct further demonstrates Milanian's pattern of registering marks for which he has no legitimate use, but for the sole purpose of interfering with the rights of others.[2]

64. It was not until after PPE's May 22, 2002 announcement that Celine Dion would be appearing for a long-running opening engagement at THE COLOSSEUM opening in March of 2003 that Milanian contacted Plaintiffs regarding his alleged rights in The COLOSSEUM mark. On or about June 1, 2002, Milanian telephoned PPE's corporate headquarters in Las Vegas, Nevada and demanded to speak with its CEO, CFO or other senior management personnel alleging that PPE

---

**2.** Around this same time, Milanian also registered a variety of domain names, including

three which contained the mark COLOSSEUM. (Tr. 293)

was violating his trademark rights in the term COLOSSEUM. (Tr. 289–291).

65. During the next ten days, Milanian filed two new intent to use applications for THE COLOSSEUM, namely Serial No. 78/134,219 for business development services (Ex. 158) and Serial No. 78/132,978 for slot machines (Ex. 155), even though he neither had a gaming license nor filed an application for a gaming license, which is required in order to manufacture or distribute slot machines. Defendants have admitted that they lacked a bona fide intent to use THE COLOSSEUM mark for slot machines because they did not have and had not applied for a gaming license. (*See* Answer at ¶ 14).

66. On or about June 11, 2002, representatives of PPE and CWI held a telephone conference with Milanian and his first attorney, Nicholas Karamanos of Pennsylvania. During this June 11, 2002 conference call, Plaintiffs were informed by Milanian's counsel that he had filed a Statement of Use for THE COLOSSEUM (Serial No. 78/059,830) on June 6, 2002, and that the evidence of use was a copy of the "resortscenter.com" web site which, as discussed above, listed COLOSSEUM as one of the trademarks under which Milanian purports to offer business management services.[3] (Tr. 316, Ex. 154). Plaintiffs understood that Milanian and his counsel highlighted the fact that a Statement of Use had just been filed because an action for trademark infringement cannot be commenced until a mark has been used in commerce. (Tr. 418–421).

67. Plaintiffs advised Milanian of CWI's well-established common law trademark rights in THE COLOSSEUM dating back to 1966, and demanded that Milanian abandon any claims to THE COLOSSEUM, including his applications for THE

COLOSSEUM, as well as any corresponding domain names. (Tr. 317). Plaintiffs made several further attempts to convince Milanian to abandon his claim in THE COLOSSEUM mark. He did not respond to those overtures, and has refused to accede to Plaintiffs' requests. (Tr., 322–323, Ex. 11).

68. Meanwhile, on June 5, 2002, CWI filed an intent to use application with the PTO for COLOSSEUM (Serial No. 76/417,751, Class 41) for "education and entertainment services, namely operating a sports, entertainment, concert, convention and exhibition arena and the production or co-production of sports and entertainment events, concerts, conventions and exhibitions for public exhibition, viewing and for radio, television and cable broadcasts." (Tr. 273; Ex. 14). This application was filed on an intent to use basis because PPE wanted to make its claims a matter of public record but needed to review its archives for specimens illustrating its use of COLOSSEUM since the COLOSSEUM convention center, as noted above, had already closed. (Tr. 274). CWI subsequently filed an Amendment to Alleged Use claiming August 6, 1966 as the date of first use. (Tr. 274).

69. The USPTO issued an office action refusing registration of this mark because it found THE COLOSSEUM mark to be merely descriptive of the services. It also questioned whether the specimens submitted were sufficient. CWI explained that the one specimen submitted to the USPTO did not include all of the exhibits made available at this trial. CWI has until May 29, 2003 to respond to the USPTO and has not yet responded. (Tr. 273–275, Ex. 14). The Court notes that the USPTO did not find CWI's mark to be generic. (Ex. 14)

---

**3.** Milanian claimed that his initial use of COLOSSEUM was in May 2000. However, his web sites do not list COLOSSEUM until August 2001.

70. On September 24, 2002, Plaintiffs' outside counsel received a demand on behalf of defendants from the law firm of Brinks, Hoffer, Gilson and Lione indicating that Milanian continued to believe he had potential claims against PPE and CWI. (Ex. 11). While the letter was written on behalf of New Las Vegas Development, LLC, Brinks Hoffer indicated to Plaintiffs' outside counsel that Milanian was connected to this entity. (See Tr. 324).

71. Plaintiffs concluded as a result of this letter that in order to protect their $95 Million dollar investment in THE COLOSSEUM that they needed to be proactive. (Tr. 354). On October 2, 2002, Plaintiffs filed this declaratory judgment action, alleging that Defendants [4] violated the Lanham Act and committed unfair competition under Nevada law with respect to COLOSSEUM and EMPIRE trademarks. Plaintiffs sought a declaration of their superior rights in those marks, an order enjoining defendants from using the marks, and for a consolidation of the trial on the merits under Rule 65.

72. Defendants filed an answer on November 26, 2002 through the law firm of Hunterton & Associates. The answer denied the salient allegations in the complaint except it admitted· that Milanian lacked a bona fide intent to use THE COLOSSEUM on gaming machines, namely slot machines and gambling devices because he does not have and has not taken steps to obtain a gaming license. (See Answer at ¶ 14). While the Answer did not include any counterclaims, it did assert two affirmative defenses of particular relevance: affirmative defense No. 5 that Plaintiffs are estopped from asserting claims to the trademarks, and affirmative

defense No. 6 that defendants possess common law and/or contractual rights to the trademarks. No facts were pled to support these defenses.

73. During a conference held by the Court on December 19, 2002, Hunterton & Associate's Motion to Withdraw as Counsel was granted. Pursuant to the Order entered that same day, the Court ordered a consolidated trial on the merits to commence on January 21, 2003.

## I. Defendants Submit The 1996 Documents.

74. On January 9, 2003, the last day by which Defendants were to file a trial brief, Gregory F. Buhyoff, Esq., on behalf of both Defendants, filed a Motion for Summary Judgment, arguing that Plaintiffs were using the mark COLOSSEUM as a generic term and thus had no standing to assert the claims in their Complaint.

75. This motion also included as exhibits certain documents purporting to show that in May 1996, Milanian submitted a proposal to ITT, the then-owner of CWI, concerning the development at Caesars Palace of a replica of the ancient Roman Coliseum and other ancient landmarks. This proposal specifically states, "[t]he following are trade secrets and intellectual properties of Mr. Cyrus Milanian." (Def. Trial Brf., Ex. H).

76. Buhyoff's Affidavit also included two other documents purporting to show that CWI apparently lost this proposal, and had agreed to maintain the confidentiality of any mental impressions revealed in Milanian's proposal. (Def. Trial Brf., Exs. I, J). Milanian emphasized his intellectual property rights multiple times, both

---

4. In addition to Milanian, Plaintiffs sued NLVD, on whose behalf plaintiffs received the September 24, 2002 letter referenced above from a law firm that was apparently engaged by both Milanian and NLVD. After trial, Plaintiffs and NLVD filed a Stipulation of Dismissal based on certain representations made by NLVD's principal, Nicholas Karamanos.

in the letter he sent to Rand Araskog, then Chairman of CWI and ITT, where he asks to, "Please regard them all as the Trade Secrets," then at the end of his Marlania proposal where he writes " *TM/SM Marks: properties of Cyrus Milanian. Copyright © 1990–1996 Cyrus Milanian, all rights reserve under U.S. and/or international laws, no part of this proposal may be copies or reproduced, duplicated, in any manner, shape or form without the prior written agreement, from Mr. Cyrus Milanian. Violaters are subject to civil and criminal prosecutions." (Def. Trial Brf., Ex. H)

77. ITT subsequently sold CWI to Starwood in approximately 1998. (Tr. 50). As noted above, CWI was then acquired by PPE on December 31, 1999.

78. Witnesses employed by PPE and CWI stated that they had no knowledge of any of these documents and had never heard of any proposal from Mr. Milanian until they saw these documents. (Tr. 157, 241). The testimony also established that each CWI person involved with these documents was no longer working with CWI when Plaintiffs began discussions with Patrick Bergé with respect to the showroom for Celine Dion. (Tr. 158).

79. In addition, PPE had reviewed CWI's building proposals in 2000 (after PPE bought CWI) and found nothing in those files about a building a replica of the ancient Roman Coliseum. (Tr. 232). PPE's in-house counsel, Mark Clayton, testified that he had reviewed the current legal files and found no copies of any of these documents. (Tr. 314). Of course, this would be consistent with the fact that they had been lost some seven years ago.

80. At trial, Plaintiffs called Patrick Bergé of Sceno Plus who testified that as

early as 1991—five years before CWI was contacted by Milanian—he had been retained by CWI to design a facility to house what became known as Cirque de Soleil's "O". The facility that Bergé designed was also to be a replica of the ancient Roman Coliseum and that he suggested calling the building Coliseum. The project, however, did not proceed. (Tr. 381).

81. Bergé further testified that he was retained by CWI again in 2000 to develop a new venue in which Plaintiffs would host a show featuring Celine Dion. Bergé's testimony, which was unrebutted by Defendants and which the Court credits, establishes that he developed the concept of designing this showcase for Celine Dion as a replica of the Roman Coliseum and the idea of calling it "Coliseum." [5]. This testimony was supported by the plans and submissions Bergé and his company made to PPE and CWI. (Tr. 389–391, Ex. 475, 476, 477).

## J. *Milanian's Failure To Appear For Deposition And The Aborted Settlement.*

82. On December 31, 2002, Plaintiffs noticed the deposition of Mr. Milanian for Monday, January 13, 2003. Mr. Milanian failed to appear at this deposition and did not notify Plaintiffs that he would not be appearing until that day.

83. On January 14, 2003, the Court held a court conference with respect to this missed deposition and was advised that the parties were discussing settlement. The parties were directed by noon on January 15, 2003 to either settle this matter or agree to a new mutually acceptable time for the Milanian deposition.

---

5. As noted above, the spelling was changed by Plaintiffs to dovetail the earlier version of The

COLOSSEUM Convention Center.

84. On January 15, 2003, the Court was advised that no settlement had been reached. Mr. Milanian's counsel provided the Court and Plaintiffs' counsel with a letter from a physician, Doctor Robert W. Brenner, stating that Mr. Milanian could not testify due to "generalized anxiety, panic attacks and depression."

85. The Court held that this physician's letter was not sufficient to justify Milanian's failure to attend his deposition. The letter did not indicate when Milanian's condition commenced or what treatment was being provided. The Court therefore directed that Milanian would be barred from testifying at trial and that it would consider favorably an application from Plaintiffs for its fees in connection with preparing for the deposition. The Court also indicated that the motion for summary judgment was untimely but accepted these papers in lieu of a trial brief.

86. On January 16, 2003 the parties believed that they had settled this matter, and were prepared to call the Court that morning to put the settlement on the record. However, on January 17, 2003, Milanian refused to settle this matter because of an alleged disagreement over whether the settlement would include a general release by him of all claims or just the trademark claims.

87. Apparently, Milanian believed that after settling his "trademark" claims, he should still be entitled to bring a claim or claims based on the events in 1996.

88. On January 17, 2003, Plaintiffs moved orally to enforce the claimed settlement, which the Court denied. At that same time, Mr. Buhyoff moved to withdraw as counsel in favor of Melvin Silverman. Melvin Silverman advised the Court that "many days" would be required to prepare for trial and again represented, without any further medical substantiation, that Milanian was not able to attend the trial.

89. The Court refused Mr. Buhyoff's motion to withdraw on the eve of trial and also ruled that the trial would go forward as scheduled. Later that day, Mr. Silverman filed an appearance and papers to be admitted *pro hac vice.*

90. On January 20, 2003, Mr. Buhyoff advised Plaintiffs' counsel that Mr. Milanian was in Nevada and requested Plaintiffs' consent to allow him to testify. Plaintiffs refused.

## K. *The Parties' Motions During The Trial.*

91. On January 21, 2003, Defendants moved this Court to reconsider its order banning Mr. Milanian from testifying. The affidavit submitted in support of this motion by Mr. Milanian contradicted his previous statements. Indeed, a second doctor's letter was attached in further support of the January 14, 2003 letter. Inexplicably, this letter was dated January 13, predating the letter it sought to explain. This submission only reinforced this Court's conclusion that the decision to bar Mr. Milanian from testifying was correct.

92. Defendant also moved to stay this trial in order to allow the question of the parties trademark rights to be adjudicated by the Trademark Trial and Appeal Board. Thus, Milanian continued to assert some rights in THE COLOSSEUM and to contest Plaintiffs' rights. The Court denied this motion.

93. Plaintiffs moved to bar Defendants from presenting any witnesses in light of these new facts, a motion the Court also denied.

94. Plaintiffs also filed a motion to reconsider their request for the Court to enforce the purported settlement. That motion was also denied.

95. Finally, Plaintiffs moved this Court for a finding that any claims by Milanian

with respect to the 1996 events be deemed barred as compulsory counterclaims that were not raised. The Court took that motion under submission and will address it below.

96. Defendants' witness list identified Peter Boynton, the former CEO of CWI, who wrote one of the letters attached to Mr. Buhyoff's affidavit in support of Defendant's Motion for Summary Judgment and then submitted to the Court as a trial brief. On January 22, 2003, defendants advised that Mr. Boynton would not be able to appear in Las Vegas and requested that he testify by telephone. (Tr. 368). The Court indicated that it was not inclined to permit such a last-minute arrangement. (Tr. 370).

97. Plaintiffs advised the Court that they had learned that one of the lawyers assisting Defendants' counsel of record had been in direct contact with Mr. Boynton and had questioned him about the 1996 events. According to representations made by this attorney, Michael Santucci, Mr. Boynton represented that he knew nothing about Mr. Milanian or the proposal contained in the 1996 documents. (Tr. 373–374).

98. The Court found that this contact with Mr. Boynton was a violation of the Nevada Rules of Professional Conduct which prohibit *ex parte* contact with employees or former employees. *See Palmer v. Pioneer and Associates, Ltd.*, 59 P.3d 1237 (2002); (Tr. 371). The Court ruled that, as a result, Mr. Boynton was barred from testifying.[6]

99. At the conclusion of trial on January 23, 2003, the Court issued certain preliminary rulings including finding that Milanian had acted in bad faith in asserting rights to COLOSSEUM and EMPIRE. The Court also required additional briefs on the issues of whether the 1996 claims were compulsory and, if not, whether there was sufficient evidence in this case to rule on the new claim in Plaintiffs amended complaint for declaratory judgment as to the 1996 counterclaims. The Court also requested a submission from the parties on attorneys' fees and damages.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1338(a), 1367 and 2201.

2. This Court has personal jurisdiction over the defendants, and venue is proper pursuant to 28 U.S.C. § 1391.

3. The Court has authority under Federal Rule of Civil Procedure 65 to conduct a final trial on the merits consolidated with the Plaintiffs' request for preliminary relief.

**I. Count One: Declaratory Judgment on THE COLOSSEUM Trademark.**

4. The Declaratory Judgment Act provides:

[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interest par-

---

**6.** Even if Mr. Boynton had not been barred from testifying as a result of the *ex parte* contact, he would still not have testified since he could only appear by telephone, and the Court ruled that it would not accept his testimony in this fashion. Furthermore there was no prejudice to Defendants by this ruling for another reason. Based on Mr. Santucci's representation that Mr. Boynton has no recollection of any events, his testimony could have had no impact on any issue before this Court but could have merely allowed defendants to authenticate the 1996 documents in Mr. Buhyoff's affidavit. Plaintiffs stipulated to their admission, thus removing any possible prejudice.

ty seeking such declaration, whether or not further relief is or could be sought. 28 U.S.C. § 2201 (1988).

5. In order to obtain declaratory relief, a plaintiff must establish that there is an actual controversy present that is ripe for adjudication. *Chiron Corp. v. Advanced Chemtech, Inc.*, 869 F.Supp. 800, 801 (N.D.Cal.1994) (citing *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 887 (Fed.Cir. 1992)). In making its determination, a court must consider "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Central Montana Elec. Power Co-op., Inc. v. Administrator of Bonneville Power Admin.*, 840 F.2d 1472, 1474 (9th Cir.1988) (citation omitted). In an infringement context, a plaintiff can meet this burden by showing it has a reasonable apprehension of being sued. *Id.; see also Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed.Cir. 1988); *Topp–Cola Co. v. Coca–Cola Co.*, 314 F.2d 124 (2d Cir.1963).

6. In this case, Milanian's conduct clearly caused Plaintiffs to have a reasonable apprehension of being sued. The Court concludes that Milanian knew of Plaintiffs' press release with respect to the building of THE COLOSSEUM and filed his applications in order to capitalize on the Plaintiffs' failure to have a federal registration for that mark. The timing of his June 1, 2002 call to PPE's headquarters and his refusal to respond to Plaintiffs' request that Milanian abandon his claim of rights in THE COLOSSEUM leads the Court to conclude that Milanian intended to wait until the eve of The Colosseum's opening to file an action against Plaintiffs. Certainly, the September 24, 2002 letter from the law firm of Brinks Hoffer to Plaintiffs' outside counsel re-

questing support for PPE's claims of priority signifies that Milanian continued to believe that he had claims of infringement.

7. In order to adjudicate this claim for relief, the Court will first consider whether Milanian had any basis to claim a superior right to THE COLOSSEUM mark. The evidence indicates that Milanian relied primarily on the fact that he had filed three intent to use applications before Plaintiffs and that therefore he had priority.

8. Milanian's reliance on his intent-to-use applications is completely misplaced. Section 1(b) of the Lanham Act was amended by Trademark Law Revision Act of 1988 (the "TLRA"), effective November 16, 1989, to allow for the filing of a trademark application by an individual with "a bona fide intention, under the circumstances showing the good faith of such person" to use the mark on the goods or services listed. The U.S. Trademark Association's official commentary to the TLRA observed that although the Act contains no precise definition of bona fide intent to use, a requirement of "good faith" is a precondition to such registration. *See* U.S.T.A., *"The Trademark Law Rev. Act of 1988,"* comment on § 1(b) at p. 43 (1989).

9. There is little case law with respect to what constitutes bona fide intent to use a mark in commerce. However, in order to prevent the intent to use amendments from being abused, the Lanham Act was also amended to clarify that "use in commerce" means "the bona fide use of the mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.

10. Based on the legislative history behind the TLRA, the test of "bona fide" intent has been interpreted to require "objective" evidence of circumstances showing "good faith." *See Lane Ltd. v. Jackson Int'l Trading Co.*, 33 U.S.P.Q.2d 1351,

1355, 1994 WL 740491 (Trademark Tr. & App. Bd.1994) ("[A]pplicant's mere statement of subjective intention, without more, would be insufficient to establish applicant's bona fide intention to use the mark in commerce.") As one commentator noted, "[t]his intention must be more than a 'wish list'". W. Bouchard, How to Get and Keep a Trademark, *Trademarks and the Arts* (2nd Ed.2000) *reprinted* in J. Ginsburg, *Trademark and Unfair Competition Law* 215 (3d Ed.2001).

11. The legislative history to these amendments provide significant guidance to this Court in evaluating whether Milanian had a bona fide intent to use THE COLOSSEUM and EMPIRE marks in commerce at the time he filed those applications. *See generally* S.Jud.Comm.Rep. on S. 1883, S. REP. No. 100–515, pp. 23, 24 (Sept. 15, 1988), U.S.Code Cong. & Admin.News 1988, pp. 5577, 5586; *reprinted in* TLRA Leg. Hist., *supra,* 23, 24. Indeed, among the examples provided of evidence that would disprove a bona fide intent to use a mark, the Senate Report included the following two which are particularly relevant to the facts of this case:

> "numerous intent to use applications for a variety of desirable trademarks intended to be used on [a] single new product ... [and] an excessive number of intent-to-use applications in relation to the number of products the applicant is likely to introduce under the applied-for marks during the pendency of the applications."

*Id.*

12. Milanian points to the fact that he has obtained several business method patents relating to a Titanic-themed casino as evidence that he had a good faith intent to use these marks in commerce.

13. While under other circumstances the holding of a patent might constitute evidence of a bona fide intent to use a mark related to the patent in commerce,

this case is not the usual case. As noted above in the Court's Findings of Fact, Milanian deliberately misrepresented the nature of the services he intended to offer in connection with his applications for consulting services. As is evident from the various websites Milanian has submitted to the USPTO to substantiate his use of his marks, Milanian was trafficking in trademarks, i.e. reserving what he perceived to be desirable names with the intent to sell or license them to others. The patent filings in this case actually further support this conclusion, for they show that Milanian was, as his counsel admitted by virtue of his questioning of Plaintiff's in-house counsel, filing his intent to use trademark applications to further protect the business ideas embodied in those patents.

14. The Court also concludes that this business model of registering numerous trademarks to assign them to others is not the normal business model used by consultants in the hotel and gaming industries. Indeed, the Court finds the Dun & Bradstreet report as evidence that as of May 2002 Milanian made no mention of his casino, hotel and related consulting services. In light of the revisions made in the TLRA to the definition of the term "use in commerce," it is clear that Milanian's intended "use" was not in accordance with the ordinary course of trade but was nothing more than a pretext for his effort to reserve rights in a series of names.

15. The statement on Milanian's web site that he was offering "licensing rights and buyout rights in the trademark service mark for resort hotel services, casino services and/or product merchandising services" makes clear that there is no other explanation for why Milanian, who otherwise has no involvement with the hotel casino industry, has invested in over 150 trademarks.

16. The Court therefore finds that Milanian's intent to use applications for COLOSSEUM and EMPIRE were not made with a bona fide intent to use and are void. They confer absolutely no priority on Milanian, or any person or entity claiming from, through or under him.

17. However, even assuming that Milanian's applications were not void *ab initio*, there are other reasons why the Court will order Judgment in Plaintiffs' favor on the first cause of action.

18. Surprisingly, notwithstanding that Milanian contacted Plaintiffs and threatened legal action based on their adoption of THE COLOSSEUM mark, Milanian's position at trial was that Plaintiffs were using the mark in a generic fashion. If true, then there was obviously no basis for Milanian to object to such use.

19. However, as discussed below, the Court specifically finds that Plaintiffs' use of COLOSSEUM was not generic. The Court notes that CWI clearly commenced use of THE COLOSSEUM mark years before Milanian could possibly claim any use. Thus, even if Milanian's intent to use applications were not void, he could still not use whatever rights he might obtain to stop a senior user who predated his application filing date. *See Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 435 (7th Cir.1999) (quoting 3 McCarthy, *Trademarks and Unfair Competition* § 19:2) (citation omitted) (hereinafter "McCarthy").

20. For all these reasons, the Court finds that Plaintiffs are entitled to judgment on their first cause of action.

## II. Plaintiffs' Second, Third, Fourth and Fifth Causes of Action: Milanian's *Infringement of their COLOSSEUM and EMPIRE Marks.*

21. The Second and Third Causes of Action both claim trademark infringement by Milanian of Plaintiffs' COLOSSEUM trademark under the Lanham Act and Nevada common law, respectively. The Fourth and Fifth Causes of Action allege, respectively, Lanham Act and Nevada common law trademark infringement with respect to Plaintiffs' rights in its EMPIRE Family of Marks.

22. The elements necessary to make out a claim of Nevada common law trademark infringement are identical to the elements necessary under section 43(a) of the Lanham Act, 15 U.S.C. s 1125(a). *General Motors Corp. v. Let's Make A Deal*, 223 F.Supp.2d 1183, 1188 (D.Nev. 2002); *A.L.M.N. v. Rosoff*, 104 Nev. 274, 277, 757 P.2d 1319 (1988). The Court will thus analyze these claims together.

23. The Lanham Act protects both registered and common-law trademarks. Section 43(a)(1) of the Act provides:

Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. *Id.* at 15 U.S.C. § 1125(a)(1).

24. This section protects against infringement of unregistered marks, trade dress, as well as registered marks. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir.1999).

25. To make out a case of trademark infringement Plaintiffs must establish that the defendant is using a mark that is (i) confusingly similar (ii) to a valid and protectable mark of the plaintiff. *See Brookfield*, 174 F.3d at 1046.

26. As noted above, there is no question of priority in this case. Plaintiffs commenced use of their COLOSSEUM and EMPIRE marks well before Milanian. Indeed, even had Milanian been able to prove actual use of COLOSSEUM before CWI, he still would not have prevailed on this element as to that mark. It is not disputed that Plaintiffs issued a press release announcing what was to become known as THE COLOSSEUM AT CAESARS PALACE shortly before Milanian filed his intent to use application.

27. Courts have consistently rejected claims by usurpers like Milanian who seek to use technical arguments to deprive the natural trademark owner of its rights. For instance, in a case that is factually analogous to the case at bar, the District Court of Maryland found that a plaintiff's use of a mark during the pre-construction and promotional stages of development of a sports stadium was sufficient to establish priority and confer trademark rights such that it could enjoin the defendant from infringing its mark. *See Maryland Stadium Authority v. Becker*, 806 F.Supp. 1236, 25 U.S.P.Q.2d 1469 (D.Md.1992). The Ninth Circuit has specifically instructed that in evaluating priority over a service mark the district courts should look to the "totality of the circumstances," including "non-sales" activities such as press releases. *Chance v. Pac–Tel Teletrac, Inc.*, 242 F.3d 1151, 1159 (9th Cir.2001). Applying the teaching of *Chance* to this case, the Court finds that Plaintiffs' use in the April 2001 press release was before Milanian filed his first intent to use application for COLOSSEUM and is sufficient to give Plaintiffs priority over that application.

## A. Plaintiffs' Use Of THE COLOSSEUM Mark Is Not Generic.

28. Milanian also attacks the validity of Plaintiffs' COLOSSEUM trademark and claims that as used by Plaintiffs COLOSSEUM is generic. Milanian specifically points to the American Heritage Dictionary definition for "coliseum" namely, "a large amphitheatre for public sports, events, entertainment, assemblies."

29. Since COLOSSEUM is not a registered mark, the burden falls to Plaintiffs to prove that the mark is not generic. *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1146 (9th Cir.1999).

30. The legal standard for determining whether a mark is generic is known as the primary significance test. If the primary significance of a particular term is the product itself and not the producer, then the term is generic. *See id.* at 1147. However, it is well established that the analysis is not quite that simple. For instance in *Filipino*, the Ninth Circuit acknowledged that the borderline between generic marks and the weakest of descriptive marks is "almost imperceptible." *See Id.* at 1151 n. 5.

31. Furthermore, "a mark is not generic merely because it has some significance to the public as an indication of the nature or class of an article. In order to become generic the principal significance of the word must be its indication of the nature or class of an article, rather than an indication of the its origin." *King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 580 (2d Cir.1963) *cited in Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 144 (2d Cir.1997). Furthermore, occasional generic usage does not destroy a trademark. Indeed, often the use of a trademark as a generic noun illustrates the power of a trademark. As

McCarthy notes, the consumer ordering "a hamburger and a Coke" is demonstrating brand loyalty, not genericness. 2 McCarthy § 12.8 at 12–20.

■ 32. The Court notes that a term may be generic for some goods and services and not generic for other terms. *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1183 (5th Cir.1980) and *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4,9 n. 6 (2d Cir.1976).

33. The evidence adduced at trial establishes that Plaintiffs used COLOSSEUM in accordance with standard trademark usage. Thus, COLOSSEUM was inevitably used by CWI in the same font and style as was used for other designations that clearly are perceived as trademarks. For example, Exhibit 124 is a brochure from the late 1960s promoting the convention services of Caesars Palace. The page titles feature many registered trademarks of CWI including CAESARS PALACE, CLEOPATRA'S BARGE, THE PIAZZA, I, CAESAR and THE COLOSSEUM; each in the identical font and type size. Thus, the Court finds that Plaintiffs treated COLOSSEUM no differently from its other valuable trademarks and not just as the name of a building or room.

34. Additionally, the Court notes that the USPTO has conducted a preliminary review of CWI's application to register COLOSSEUM as a trademark for "[e]ducation and entertainment services, namely operating a sports, entertainment, concert, convention and exhibition arena and the production or co-production of sports, and entertainment events, concerts, conventions and exhibitions for public exhibition, viewing and for radio, television and cable broadcasts, in International Class 41." (Ex. 14). Significantly, the USPTO did not refuse registration on the basis that the mark was generic, but found the mark to be descriptive. (Tr. 275–277, Ex. 14).

■ 35. Courts should give deference to the opinion of the Examining Attorney. *See* 5 McCarthy, § 32:95.

36. Furthermore, Plaintiffs note that THE COLOSSEUM AT CAESARS PALACE is not, strictly speaking, an amphitheatre. The American Heritage Dictionary defines this term as "an oval or round structure having tiers of seats rising gradually outward from an open space or arena at the *center.*" (emphasis added). As Patrick Bergé noted, an amphitheatre is best understood to describe a stadium like format where the crowd surrounds the field or stage as opposed to a typical theatre where the stage is in front of and not in the center of the audience. (Tr. 397–398). Testimony from an individual who is familiar with the marketplace usage of a designation or term in question provides helpful evidence regarding the issue of genericness. *See* 2 McCarthy, § 12:13(5).

37. The use of the term COLOSSEUM to describe THE COLOSSEUM Convention Center was clearly not descriptive as there was no elevated seating and the structure was square. The same is true of the COLOSSEUM Showcase at Caesars Indiana. While THE COLOSSEUM AT CAESARS PALACE is round and has elevated seating, the evidence shows that there are significant differences between this structure and a true 'coliseum.'

38. Notwithstanding the dictionary definition, based on the testimony, it is clear that the most common understanding of the term 'coliseum' today is to refer to a sports venue with seating all the way around a central field. (Tr. 235, 397–398). A 'coliseum' has a large audience capacity such as the Los Angeles Coliseum which seats 100,000 sports fans. (Tr. 235).

39. In contrast, THE COLOSSEUM AT CAESARS PALACE seats only 4,000. (Tr. 150–51). Furthermore, as specially designed by Bergé, the farthest seat from

the stage, which is not in the center of the building but at the front, is 120 feet. The St. Louis Rams might still be playing at the Los Angeles Coliseum if this were typical of coliseum-like seating.

40. Of course, determining genericness requires the Court to examine the nature of the services offered in connection with the mark. *Soweco, Inc.*, 617 F.2d at 1183. Milanian does not contest this proposition and indeed argues that his intended use for The Colosseum for, *inter alia*, gaming and product merchandising is not generic. (Tr. 514–520). Having found that Plaintiffs have priority over Milanian, the Court concludes that Plaintiffs' use of THE COLOSSEUM mark for those goods and services is not generic. The Court also finds that Plaintiffs' use of THE COLOSSEUM for food, non-sports related entertainment, banquet and meeting services is not generic, as there is no evidence that these services are associated with use of the word for a sports arena.

41. Thus, Plaintiffs' use of THE COLOSSEUM to designate restaurant services at the Cove Haven Caesars Pocono Resort, entertainment services at Caesars Indiana, or a variety of non-sports related services at Caesars Palace are suggestive of the grandeur and excitement associated with the ancient Roman Coliseum or sports events that occur in modern coliseums.

42. Even if COLOSSEUM as used by Plaintiffs is descriptive, the Court finds based on CWI's extensive use of the mark for over 35 years, the fact that more than 11 million individuals have utilized these services, and the large sums of money spent to promote this mark, that the mark has secondary meaning.

43. Descriptive marks with secondary meaning are protectable trademarks. *See Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 910 (9th Cir.1995).

Thus, whether the mark is suggestive or descriptive with secondary meaning, it is clear that Plaintiffs have satisfied the first prong of the infringement test with respect to THE COLOSSEUM mark.

44. Defendant does not contest the validity of Plaintiffs' EMPIRE Family of Marks. The Court finds that CWI has used its EMPIRE Family of Marks dating back to at least 1968 in connection with a wide array of services including hotel, restaurant, entertainment, and gaming.

45. Thus, Plaintiffs have satisfied the first prong of the infringement test for its EMPIRE Family of Marks.

**B. Milanian's Infringement Of Plaintiffs' Marks**

46. Having determined that Plaintiffs own THE COLOSSEUM and EMPIRE marks and that the marks are valid, the next step is to determine whether the similarity of the marks is likely to confuse the public as to the source of the products or services. *See Shakey's Inc. v. Covalt*, 704 F.2d 426, 431 (9th Cir.1983); *Riggs Marketing, Inc. v. Mitchell*, 993 F.Supp. 1301, 1309 (D.Nev.1997).

47. In *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979), the Ninth Circuit set forth the following factors, commonly referred to as "the *Sleekcraft* Factors," to determine whether there is a likelihood of confusion.

(1) similarity of the marks;

(2) proximity or relatedness of services;

(3) strength of the mark;

(4) evidence of actual confusion;

(5) marketing channels used;

(6) type of goods and degree of care likely to be exercised by the purchaser;

(7) defendant's intent in selecting the mark;

(8) likelihood of expansion of the product line.

*Id.* at 348.

48. Application of these factors is case-specific, however similarity of the marks and whether the two users compete in the same industry are always important. *Brookfield,* 174 F.3d at 1054.

**Factor 1: Similarity of the Marks**

■■■ 49. In determining the similarity of marks, a court must examine the marks in their entirety as they appear in the marketplace along with the relevant appearance, sound and meaning. *See Dreamwerks Prod. Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1129 (9th Cir.1998). Simply put, "the 'combination of features as a whole' rather than a difference in some of the details ... must determine whether the competing product is likely to cause confusion in the minds of the public." *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 954 (2d Cir.1980) (citations omitted). Here, the respective COLOSSEUM marks are obviously identical or differ only by virtue of the word "the" or "Caesars Palace". In addition, Defendants' claim to ROME LAS VEGAS COLOSSEUM is also virtually identical to COLOSSEUM, given that CWI has used THE COLOSSEUM AT CAESARS PALACE in Las Vegas as part of its well-known Roman–Grecian theme.

■■■ 50. Absolute identity between the marks, however, is not necessary for a finding of consumer confusion. *See Washington Speakers Bureau Inc. v. Leading Authorities, Inc.,* 33 F.Supp.2d 488, 497 (E.D.Va.1999). Confusing similarity of marks may also be established under the "Family of Marks" doctrine. A trademark owner may use a number of marks with a common feature or "surname" that is distinctive enough to be recognized by the consuming public causing them to associate such derivative marks with the trademark owner. *See Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 395 (7th Cir. 1992) ("[A]pplication of the doctrine requires a showing that the family feature or 'surname' is distinctive enough to trigger recognition 'in an of itself' ") (citation omitted). "A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are comprised and used in such a way that the consuming public associates not only the individual marks, but the common characteristic of the family, with the trademark owner." *J & J Snack Foods Corp. v. McDonald's Corp.,* 932 F.2d 1460, 1462 (Fed.Cir.1991)

51. For example, MC and MAC are a well-known family of marks associated with the fast food chain McDonalds's Corp. *See McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268, 1 U.S.P.Q.2d 1761 (S.D.N.Y.1986) ("MC" family of mark was found to be infringed by the use of McBagel's on a bagel bakery and restaurant). A "Family of Marks" will be found upon a showing that the designation constituting the common feature or "surname" of the family is in fact recognized by the public as a trademark in and of itself. *Primedia Intertec Corp. v. Technology Marketing Corp.,* 35 F.Supp.2d 809, 817 (D.Kan.1998).

52. Plaintiffs have established their rights to a family of EMPIRE marks including: EMPIRE, THE JEWEL OF THE EMPIRE, CAESARS MOUNTAIN EMPIRE, THE GLORY OF THE EMPIRE, ONWARD TO THE EMPIRE, THE ROMAN EMPIRE, GUIDE TO THE EMPIRE, ENCHANTMENT AT THE EMPIRE, ENJOY THE EMPIRE, BEHOLD THE EMPIRE, CAESARS MAGICAL EMPIRE, REBUILDING THE EMPIRE, EXPANDING THE EMPIRE, and others including, EMPERORS CLUB, and the EMPERORS EVERYDAY GIVEAWAY. Milanian's THE EMPIRE and THE ROMAN EMPIRE bear

similarity to CWI's family of EMPIRE marks in that the ordinary consumer is likely to conclude that the goods and services offered under the marks originate from, or are performed by, Plaintiffs.

53. Thus, this factor weighs strongly in Plaintiffs' favor for both marks.

**Factor 2: Relatedness of the Services**

54. The next step is to consider the relatedness of the services. The more related the services, the greater the danger that the public will incorrectly assume that there is a connection between the producers, despite the fact that no relationship exists. *See Sleekcraft*, 599 F.2d at 350 (citation omitted). "Complimentary products or services are particularly vulnerable to confusion." *Sleekcraft*, 599 F.2d at 350 (citing *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1253 (4th Cir.1970)).

55. Milanian argues that his consulting services are not related to the services offered by Plaintiffs. The Court disagrees.

56. First, Milanian's claim, first made on June 1, 2002, that Plaintiffs were infringing his rights undercuts his argument that his services are unrelated to those offered by Plaintiffs.

57. Second, Milanian's application to register JULIUS CAESAR for consulting services relating to hotels and casinos was refused registration based on the prior registration for CAESARS by CWI for hotel and casino services. (Tr. 289). Thus, the Examining Attorney found sufficient relatedness to refuse registration even when the marks were not so close as here (*Caesars vs. Julius Caesars* in contrast to *The Colosseum vs. Colosseum*).

58. Third, as previously discussed, Milanian claimed consulting services for hotels and casinos as a first step in assigning these marks to a hotel or casino for their use on their services. Thus, he saw them as sufficiently related to allow him to assign the marks as part of his "project package."

59. Finally, as did the T.T.A.B. in the *Cunard* case, the Court notes that even if it is true that consultants market their services to different end-users than do hotels and casinos, a consultant's specialized audience is still part of the general public susceptible to source confusion. *Cunard, supra*, at 16.

60. Under these circumstances, this factor leans in Plaintiffs' favor.

**Factor 3: Strength of the Mark**

61. It is well settled that the strength of a mark refers to "the distinctiveness, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *E.I. DuPont de Nemours & Co. v. Yoshida Intern., Inc.*, 393 F.Supp. 502, 512 (E.D.N.Y.1975). In determining the distinctiveness of a mark, courts consider two factors: "its inherent distinctiveness, and its distinctiveness in the marketplace." *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743–44 (2d Cir.1998). "Marks are often classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998). Marks that are inherently distinctive such as arbitrary, fanciful or suggestive marks do not require proof of secondary meaning in order to be protected. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). A descriptive mark, however, can become protectable "provided that it has acquired 'secondary meaning' in the minds of consumers, i.e., it has become distinctive of the trademark applicant's goods in commerce." *Filipino*, 198 F.3d at 1147.

62. Arbitrary and fanciful marks are strong marks, and are afforded greater protection. *See Brookfield,* 174 F.3d at 1058. Fanciful marks are "coined" terms that are invented or selected for the sole purpose of functioning as a trademark. *Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694, 700 (2d Cir.1961). Arbitrary marks are words commonly used in the English language, but when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services. *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 611 (7th Cir.1965).

63. A "suggestive" term suggests rather than describes an ingredient, quality, or characteristic of the goods and requires imagination, thought, and perception to determine the nature of the goods, while "descriptive" term specifically describes a characteristic or ingredient of an article or service. *Abercrombie & Fitch,* 537 F.2d at 10–11. For example, ACTION SLACKS was found to be merely suggestive for pants. *See Levi Strauss & Co. v. R. Josephs Sportswear,* 28 U.S.P.Q.2d 1464, 1993 WL 444262 (Trademark Tr. & App. Bd.1993). Similarly, the mark CITIBANK for an urban bank was found to be suggestive, not requiring proof of a secondary meaning. *See Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540 (11th Cir.1984).

64. The Court has already determined that Plaintiffs' COLOSSEUM mark is suggestive and that, even if only descriptive, there is sufficient evidence of secondary meaning to make it protectable.

65. CWI's EMPIRE Family of Marks is fanciful. The word EMPIRE used in connection with hotel, casino, gaming, and entertainment services bears no relationship to these services. Moreover, the court finds that the EMPIRE mark been used continuously for over 35 years on a variety of promotional materials in connection with CWI's services.

66. Based on the large number of consumers exposed to these marks and the continuous use of these marks in countless promotional pieces on a regular basis, the Court concludes that both marks are strong.

67. This factor goes in Plaintiffs' column.

**Factor 4: Actual Confusion**

68. In the Ninth Circuit, evidence of actual confusion is not required to establish a violation of the Lanham Act. *See Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir.1991). In fact, such a showing where there has been insignificant commercial activity by the infringer would work to penalize the trademark owner for taking prompt steps to protect his/her rights. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 873 (2d Cir.1986).

69. Milanian's only known use of THE COLOSSEUM and EMPIRE marks is the display of these marks on his web site. Although offered in conjunction with his consulting services, there is no evidence that he has been hired to provide such services to anyone in the casino industry. Consequently, the Court does not find it surprising that there is no evidence of actual confusion.

70. This factor is therefore neutral.

**Factor 5: Marketing Channels**

71. Plaintiffs' use of a variety of methods to promote their COLOSSEUM and EMPIRE Family of Marks including the Internet. Over one million "unique" individuals have visited the Caesars web site since it began to promote the Celine Dion show at THE COLOSSEUM entertainment center, making prominent use of both THE COLOSSEUM mark and EMPIRE Family of Marks.

72. Milanian, as discussed above, promotes his claims to ownership of these registrations and pending applications on the Internet. Thus, the Court concludes that there is overlap in the channels of trade used by the parties. This factor also weighs in favor of Plaintiffs.

### Factor 6: Wrongful Intent

73. A plaintiff need not prove wrongful intent to show trademark infringement. *Brookfield,* 174 F.3d at 1059. However, where it is shown that the alleged infringer knowingly adopted the infringing mark, courts will presume that it can achieve its purpose in deceiving the public. *Sleekcraft,* 599 F.2d at 354.

74. The Court has already concluded that Milanian had knowledge of Plaintiffs' announcement to build a new entertainment complex to be called THE COLOSSEUM when he filed his first intent to use application for COLOSSEUM. The Court finds the filing of this application to have been done in bad faith in an attempt to cast a cloud over Plaintiffs' rights to use the mark for the new convention center. The Court also finds that Milanian was aware of the Plaintiffs' EMPIRE Family of Marks and that his filing for these marks were also done in order to obtain leverage over Plaintiffs for the purposes of extracting monies from them.

75. Additionally, as previously noted, the Court finds that Milanian did not have a bona fide intent to use the contested marks when he filed his intent to use applications.

76. This course of conduct directly supports a conclusion that Milanian's efforts to acquire rights in COLOSSEUM and EMPIRE was done in bad faith.

### Factor 7: Product Expansion

77. Based on Milanian's obvious interest in successfully entering the world of gaming and hotels, it is self-evident that he hopes to expand his services from consulting to actual hotel and casino services. Thus, this factor, too, weighs in favor of Plaintiffs.

78. Based on a consideration of the *Sleekcraft* factors, the Court finds the identity (or near identity) of the trademarks, the relatedness of the businesses, the relative strength of Plaintiffs' mark, the overlap between the respective marketing channels used by the parties, Milanian's bad faith, and the likelihood of expansion that Milanian's use of THE COLOSSEUM and EMPIRE marks on the Internet are likely to cause confusion. The Court also finds that Milanian's own assertion in June of 2002 that there would be confusion further shows a likelihood of confusion.

79. The Court also notes that its conclusion that Milanian's use of the Plaintiffs' marks creates a likelihood of confusion in the market place is supported by the doctrine of initial interest confusion. *See Interstellar Starship Services, Ltd. v. Epix Inc.,* 184 F.3d 1107, 1110 (9th Cir.1999). Initial interest confusion results when the defendant uses the plaintiff's trademark "in a manner calculated 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion.'" *Brookfield,* 174 F.3d at 1062 (quoting *Dr. Seuss Enters. v. Penguin Books,* 109 F.3d 1394, 1405 (9th Cir.1997)).

80. No one could reasonably deny that a computer consulting firm calling itself "APPLE" would benefit from the initial positive reach of potential customers. Similarly, a consultant to the hotel and casino industry is going to gain an initial advantage by associating him with one of the strongest brands in the gaming industry.

81. Based on these findings, the Court grants judgment to Plaintiffs on Counts Two, Three, Four, and Five of their Amended Complaint.

### III. The Compulsory Counterclaim Issue.

82. As noted above, Plaintiffs requested the Court rule that Milanian waived any claims relating to developing the concept of The Colosseum as a result of his not bringing them as compulsory counterclaims. Specifically, Plaintiffs requested that potential claims relating to the 1996 documents be barred as compulsory counterclaims.

83. Under the Federal Rules of Civil Procedure, pleadings "shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." *Fed.R.Civ.P.* 13(a).

84. The rule is liberally applied and "was designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters." *Southern Constr. Co. v. Pickard,* 371 U.S. 57, 60, 83 S.Ct. 108, 9 L.Ed.2d 31 (1962). A subsequent action cannot be maintained where the claims asserted should have been brought as compulsory counterclaims in a previous action. *See Springs v. First Nat'l Bank,* 835 F.2d 1293, 1296 (9th Cir.1988); *see also* 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane § 1417, p. 129 (1990).

85. The Ninth Circuit utilizes the "logical relationship test" to determine whether two claims arise our of the same "transaction or occurrence." *See Pochiro v. Prudential Ins. Co. of America,* 827 F.2d 1246, 1249 (9th Cir.1987). Under the test, a counterclaim is compulsory if there is any "logical relationship" between the claim and the counterclaim. *Id.*

86. It is not necessary for the facts or the legal theories to be the same or even substantially the same in both actions. As long as the facts of the later asserted claim "are sufficiently related to subject matter of the original action, they must be barred as compulsory claims." *Pochiro,* 827 F.2d at 1251. If a separate trial on each of the respective claims would involve a substantial duplication of time and effort by the parties and the court, a logical relationship will be found. *See Pickard,* 371 U.S. at 60, 83 S.Ct. 108; *see also USM Corp. v. SPS Technologies, Inc.,* 102 F.R.D. 167, 171 (N.D.Ill.1984).

87. Here, the Court finds that any claim arising out of or related to the events of 1996 were compulsory counterclaims. The subject matter of the action was the ability of Plaintiffs to open The Colosseum without threats of legal action from Milanian. In addition, Milanian listed the 1996 document as trial exhibits and former CWI employees related to the 1996 documents as trial witnesses.

88. The Court also finds that a claim by Milanian in another case that he "owns" the idea to develop a replica of the Roman Coliseum or that PPE and CWI violated some duty to him in developing the concept would necessarily duplicate the testimony in this case from Deborah Munch, Donald Chandler, and Patrick Bergé on the development of The Colosseum. Defendants did not object to that testimony; indeed, they cross-examined those witnesses on those issues, and also presented evidence about the issues on their case in-chief.

89. Thus, there would be substantial factual overlap between this case and a suit by Milanian relating to The Colosseum.

90. The compulsory counterclaim rule requires only that the legal theories in the claims and the counterclaims be related.

*See Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 625 (9th Cir.1991). Here, the May 1996 document submitted by Milanian indicated that he was containing trademark rights in connection with his proposal to build a replica of the ancient Roman Coliseum. Moreover, the 1996 documents were obviously relevant to several other defenses such as unclean hands and related to the theory that Milanian's rights in "intellectual property" were infringed by Plaintiffs. Indeed, Milanian recognized the relevance of these facts to this case when he included in his answer to the complaint affirmative defenses based on estoppel and that he had contractual rights to the trademarks.

91. The close factual and legal connection between claims based on the 1996 events and the subject matter of this cases means that such claims should have been asserted as compulsory counterclaims. *See, e.g., Alltrade,* 946 F.2d at 625; *Official Airline Guides, Inc. v. Churchfield Publications, Inc.,* 756 F.Supp. 1393, 1407 (D.Or.1990).

92. Milanian's failure to assert claims related to the 1996 events as compulsory counterclaims in this action means that he has waived them. *See In re Pinkstaff,* 974 F.2d 113, 115–116 (9th Cir.1992); *Pochiro,* 827 F.2d at 1251; *Springs v. First National Bank of Cut Bank,* 835 F.2d 1293, 1295 (9th Cir.1988); *see also* 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane § 1417 at 129.

93. This Court has the discretion to enjoin a party from bringing its compulsory counterclaim in a subsequent federal [state or foreign] court action. *See Seattle Totems Hockey Club, Inc. v. National Hockey League,* 652 F.2d 852, 854–855 (9th Cir.1981), *cert. denied,* 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982). That will be the remedy ordered in this case.

94. Plaintiffs are scheduled to open The Colosseum and introduce Celine Dion in late March 2003. Given their substantial investment and Milanian's conduct in both creating the dispute and in conducting this litigation, an injunction is appropriate to preclude the possibility of Milanian filing another lawsuit around the time The Colosseum is scheduled to open.

## IV. Plaintiffs' Sixth Count For Declaratory Relief Against Milanian.

95. The Court's finding that Milanian, or any person or entity claiming from, through or under him, waived his right to assert counterclaims relating to the 1996 events means that it need not consider Plaintiffs' amendment of the Complaint to add a declaratory judgment count (Count Six). Nevertheless, the Court finds, for the reasons set forth below, that judgment should be awarded to Plaintiffs on such a claim.

96. There is a clear, concrete controversy between Plaintiffs and Milanian regarding Milanian's alleged contractual and common law rights in the concept of building a replica of the ancient Roman Coliseum. The nature of the 1996 documents and Milanian's refusal to provide a general release as the sole basis for the rejecting a settlement on the eve of trial establish the existence of such a controversy. In addition, Milanian's counsel consented to an amendment during the first day of trial (Tr. 22), indicating that Milanian and his counsel were on notice of the amended claims. *See S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1314 (9th Cir.1982) (basic inquiry under Rule 15 is whether opposing party is on notice of the amended claim).

97. Moreover, Milanian conducted the trial as though the 1996 events were part of it, and his failure to object to the evidence about the 1996 events also shows that he has consented to try those issues in this case. *See Fed.R.Civ.P.* 15(b); *Casey v. Lewis,* 43 F.3d 1261, 1268 (9th Cir.1994), *rev'd on other grounds,* 518 U.S. 343, 116

S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see generally* 3 *Moore's Federal Practice* at § 15.18[1].

98. Plaintiffs seek a declaration that they breached no duty, in contract or tort, to Milanian in connection with developing the concept of The Colosseum. As a declaratory judgment defendant, Milanian bears the burden of proof to show that a contractual or common law duty was owed to him by Plaintiffs, and that they breached such a duty. *See Vivid Techs. Inc. v. Am. Science & Eng'g, Inc.,* 200 F.3d 795, 802 (Fed.Cir.1999) (citing 12 *Moore's Federal Practice* § 57.62[2][d] (3rd ed.1997)).

■ 99. To establish a valid contract under Nevada law, Milanian would have to show an offer, acceptance, and bargained-for consideration. *See D'Angelo v. Gardner,* 107 Nev. 704, 744, 819 P.2d 206, 233 (1991). Milanian has failed to establish that a valid contract existed between him and CWI. Despite providing copies of the 1996 documents, Milanian did not move the documents into evidence.

■ 100. Even considering the August 1996 David Mitchell Certification as establishing a contractual relationship, in which CWI agreed not to use such information without Milanian's consent, the Court finds that there was no evidence that either plaintiff breached the contract.

101. Milanian failed to elicit any evidence that demonstrates that CWI used any of the information in his proposal in the conception, design, and building The Colosseum. Indeed, the undisputed evidence demonstrated that Plaintiffs developed the idea of building a new showroom in early 2000, engaged Sceno Plus in May 2000 to develop designs for a new showroom, and that Sceno Plus came up with the idea of a showroom that would resemble the ancient Roman Colosseum and proposed that it be called "Coliseum."

102. Accordingly, the Court finds that Plaintiffs breached no contractual duty to Milanian, or any person or entity claiming from, through or under defendant Milanian, in connection with The Colosseum.

103. The Court reaches a similar conclusion with respect to a claim by Milanian in tort that Plaintiffs misappropriated his trade secrets or otherwise converted his intellectual property.

■ 104. A claim for trade secret misappropriation includes: (1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose. *Frantz v. Johnson,* 116 Nev. 455, 466, 999 P.2d 351, 358 (2000).

■ 105. Conversion under Nevada law requires proof of an act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with, his rights in that property. *Evans v. Dean Witter Reynolds, Inc.,* 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000).

106. A trade secret is defined as:

... information, including, without limitations, a formula, pattern, compilation, program, device, method, technique, product, system, process, design, prototype, procedure, computer programming instruction or code that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain it secrecy. Nev.Rev.Stat. 600A.030(5).

 107. Milanian did not establish that the idea of building a replica of the ancient Roman Coliseum at a property already employing an elaborate Roman theme constitutes a trade secret. The evidence concerning the use of a Roman theme at Caesars Palace shows that this concept is "readily ascertainable by proper means by . . . persons [i.e. CWI] who can obtain commercial or economic value from its . . . use" and thus is not a trade secret under Nevada law. *See id.*

108. Although courts recognize a proprietary interest in ideas that are not trade secrets, those ideas must be novel. *See Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 378 (2d Cir.2000).

109. The idea of building a replica of an ancient Roman building is not a novel idea, for the evidence showed that Caesars Palace had made wide use of Roman-theme design there since 1966 and that the idea of a replica of the Roman Coliseum was conceived by Mr. Bergé in 1990, and again in 2000.

110. Even if Milanian had established that his ideas were protectable or somehow "intellectual property," there is no evidence that Plaintiffs' misappropriated them.

111. As discussed above, there was no evidence in that anyone involved in The Colosseum concept or design knew of Milanian's proposal to CWI, or that CWI misused (or even still had) Milanian's proposal in 2000. Indeed, the August 1996 documents themselves suggest that the proposal was discarded by CWI. The uncontroverted evidence was that none of the witnesses had any knowledge of the 1996 documents. It was also undisputed that Sceno Plus independently developed the idea of a replica of ancient Roman Coliseum, which also defeats Milanian's trade secret or conversion claims. *See Eco–Separator Co., Inc. v. Shell Canada Ltd.,* 12 U.S.P.Q.2d 1635, 1637, 1989 WL 37236 (9th Cir.1989); *see also Kewanee Oil Company v. Bicron Corporation,* 416 U.S. 470, 474, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974).

112. Because the undisputed evidence shows that Plaintiffs violated no right of Milanian's in connection with development of The Colosseum, the Court awards judgment to Plaintiffs on Count Six of the Amended Complaint.

## V. Remedies

### A. Declaratory Judgment

113. Plaintiffs have established that there is a controversy that is ripe for adjudication. *See Shell Oil,* 970 F.2d at 887. In order to prevent defendants from interfering with Plaintiffs' rights to the aforementioned marks or interfering with the opening of The Colosseum showroom, the Court declares: (1) that use by CWI and PPE, and any of their respective agents or representatives, of THE COLOSSEUM trademark does not infringe any rights of defendant Milanian, or any person or entity claiming from, through or under defendant Milanian; (2) that defendant Milanian, or any person or entity claiming from, through or under defendant Milanian; has no right, title to THE COLOSSEUM and ROME LAS VEGAS COLOSSEUM, or any mark or domain name including the COLOSSEUM and EMPIRE marks; and (3) that Plaintiffs breached no duty, in contract or tort, to Milanian, or any person or entity claiming from, through or under defendant Milanian; in connection with the development of The Colosseum.

### B. Permanent Injunction

114. The requirements for a permanent injunction are virtually the same as those for a preliminary injunction, except that for a permanent injunction success on the merits must be shown. *See Hilton Hotels Corp.,* 978 F.Supp. at 1345. Conse-

quently, Plaintiffs must also show (1) irreparable harm; (2) that the balance of the equities weigh in their favor; and (3) that the grant of the injunction is in the public interest. *See Stanley v. University of Southern California,* 13 F.3d 1313, 1319 (9th Cir.1994).

### 1. Irreparable Harm

115. Having concluded that Plaintiffs have succeeded on proving infringement, the Court need not address the issue of irreparable harm because as indicated previously, once trademark infringement is established through a showing of a likelihood of confusion, irreparable injury is presumed. *See Brookfield,* 174 F.3d at 1066.

### 2. Balance of the Equities

116. The equities also weigh heavily in Plaintiffs' favor. Plaintiffs have established that they have invested millions of dollars promoting the marks. They (and others) have also committed enormous resources in connection with opening THE COLOSSEUM entertainment center. THE COLOSSEUM and EMPIRE marks have become associated with the exceptional products and services offered by the Plaintiffs. The potential confusion in allowing Milanian to display these marks on the Internet is likely to damage Plaintiffs' reputation. Consequently, the balance of the equities weighs in favor of enjoining defendant from his further unlawful use.

### 3. The Public Interest

117. The public interest factor also weighs in Plaintiffs' favor. An important factor in protecting trademarks is to avoid consumer confusion, which is in the public interest. *See, e.g., Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1523 (9th Cir.1992) (in the context of copyright infringement). It has been established that, Milanian's display of the mark will cause the consumer to be confused as to the source of the products and services offered by Milanian. It is in the public interest not to allow Milanian to mislead the public into thinking that the services offered by Milanian are somehow related to the Plaintiffs when in fact they are not. Enjoining defendants from further display or future use of the marks is necessary to prevent consumer confusion.

118. The Court thus finds that Plaintiffs have satisfied the requirements for a permanent injunction, precluding defendant Milanian from using or displaying COLOSSEUM or EMPIRE including the registration of domain names incorporating these trademarks.

119. This Court orders that Milanian, his agents, servants and employees, or any person or entity claiming from, through or under him, and all those persons in active concert with them are hereby forever enjoined from using the marks THE COLOSSEUM, ROME LAS VEGAS COLOSSEUM, THE ROMAN EMPIRE and THE EMPIRE, or any designations incorporating the words "COLOSSEUM" or "EMPIRE" similar thereto or likely to cause confusion therewith, in the sale, offering for sale, distribution or advertising of casino and casino-related products and services, hotel, restaurant and entertainment services, consulting services to the casino or hotel industry, or similar merchandise and services in any locality in the United States. This injunction includes the registration of any domain name incorporating these terms

120. The Court also finds that based on defendant Milanian's failure to bring any counterclaims relating to 1996 events, that he or any person or entity claiming from, through or under him, has waived such claims and is enjoined from filing such claims in any court.

121. The Court also enjoins Milanian from taking any further action to register any of the aforementioned trademarks.

## C. Cancellation of Applications and Registrations

122. Section 37 of the Lanham Act, 15 U.S.C. § 1119, confers upon the Courts concurrent authority with the USPTO to cancel or otherwise determine the rights to trademark registrations. Cancellation is an appropriate remedy where the litigation revolves around an action for infringement involving a registered mark. *See Sperry Rand Corp. v. Seawol Distributors, Inc.,* 140 U.S.P.Q. 532 (S.D.Cal.1964). As this Court has determined that Plaintiffs have priority over defendants to THE COLOSSEUM, ROME LAS VEGAS COLOSSEUM, THE ROMAN EMPIRE and THE EMPIRE marks, it hereby orders that the PTO cancel Milanian's applications and/or registrations related to the above marks.

## D. Transfer of Domain Names

123. The use of a domain name that infringes a owner's trademark rights provides a basis for transferring ownership of the domain name. *See* 15 U.S.C. § 1125(d)(2)(D). This Court finds that Plaintiffs have demonstrated that the domain names lasvegascolosseum.com, colosseumlv.com, and colosseumlasvegas.com are likely to cause consumer confusion. The three most important *Sleekcraft* factors considered by Courts in determining the likelihood of confusion in the context of web names are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the parties' simultaneous use of the Web as a marketing channel. *GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1204 (9th Cir., 2000). Although the court has discussed these factors in detail above, it will briefly address them as they apply to these domain names.

124. This court finds a visible similarity between the domain names when compared to Plaintiffs' COLOSSEUM mark. Further, Plaintiffs use this web site in promoting its services under the COLOSSEUM mark and have had approximately one million "unique" visitors on the site in only the last six months making it a pivotal marketing tool. This Court therefore concludes that allowing Milanian to maintain ownership of the lasvegascolosseum.com, colosseumlv.com, and colosseumlasvegas.com domain names is likely to cause consumer confusion, and orders the Milanian, or any assignee or transferee, to transfer the domain names to CWI within ten business days of this order. Milanian shall pay any transfer fees necessary to accomplish their transfer.

## E. Attorneys' Fees

125. Section 35(a) of the Lanham Act provides that a court may award attorneys fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). Because prevailing parties are entitled to recover for claims under Section 43(a), one who holds common law trademark rights is entitled to recover fees. *See id.*

126. Generally, a trademark case is exceptional for the purposes of an award of attorneys' fee when the infringement is malicious, fraudulent or willful. *Mirage Resorts, Inc. v. Stirpe,* 152 F.Supp.2d 1208, 1218 (D.Nev.2000) (citing *Lindy Pen Co. Inc. v. Bic Pen Corp.,* 982 F.2d 1400, 1409 (9th Cir.1993)). The "exceptional cases" requirement is also satisfied where the court finds that claims with respect to trademark rights are "groundless, unreasonable, vexatious, or pursued in bad faith." *Cairns v. Franklin Mint Co.,* 292 F.3d 1139 (9th Cir.2002) (citation omitted); *Lindy Pen,* 982 F.2d at 1405.

127. Irrespective of whether the party seeking the fees is a plaintiff or defendant, the issue is whether the claims or defenses were "groundless," "unreasonable," or

maintained "in bad faith" so as to meet the "exceptional cases" requirement. *See Stephen W. Boney, Inc. v. Boney Services, Inc.*, 127 F.3d 821, 827 (9th Cir.1997).

 128. Here, Plaintiffs demonstrated that Milanian's attempt to pirate away their rights in COLOSSEUM and EMPIRE theme marks was part of his overarching plan to traffic in trademarks. Notwithstanding the statutory requirements, Milanian filed many trademark applications with no *bona fide* intent to use the trademark in question. His pattern or practice was to file bogus intent-to-use applications for marks, and attempt to sell or license the "rights" in the marks.

129. Milanian's calculated application for THE COLOSSEUM mark just after the announcement of the construction of THE COLOSSEUM showroom, as well as his concealing of a claim in these alleged rights to the mark until just days after the announcement of its opening with Celine Dion performing, demonstrates that his objective was to hold Plaintiffs hostage. Those facts make this case exceptional under 15 U.S.C. § 1117(a) and justify entering a judgment against Milanian and in favor of Plaintiffs in an amount equal to their attorneys' fees in prosecuting this matter.

130. In addition, Milanian's "legal positions" are further proof that his case was meritless. For example, notwithstanding his demanding June 1 telephone call to PPE, Milanian argued in his "summary judgment" brief that Plaintiffs' use of The Colosseum mark was generic, and therefore could not possibly infringe any alleged rights he had in the marks. That position means that his telephone call to PPE's offices on June 1, 2002, demand to speak with the CEO, and statement that Plaintiffs were violating his rights in The Colosseum mark, all had no legitimate purpose. That course of conduct also makes this case "exceptional" and justifies an award of fees.

 131. Under Nevada law, attorneys' fees may be awarded to the holder of a common law mark where the infringer's acts are found to be willful and calculated to trade upon the goodwill of the trademark owner. *See 7–11 Minit Markets, Inc. v. Southland Corp.*, 301 F.Supp. 1000, 1001 (D.Nev.1969). For the reasons stated above, Milanian's conduct constituted infringement and unfair competition under Nevada law and was both willful and was calculated to trade upon the goodwill of Plaintiffs, thereby entitling Plaintiffs to an award of attorneys' fees under Nevada law.

132. Nevada State Law also provides for the award of attorneys fees to the prevailing party in a trade secret misappropriation case in Nev.Rev.Stat. 600A.060. Plaintiffs are also entitled to fees for this claim as well. The Court therefore orders Plaintiffs to submit an application detailing the attorneys' fees and costs expended in relation to those claims within 30 days of this order. Defendant may submit an opposition to this brief limited to the issue of the reasonableness of such fees within fifteen days of Plaintiffs' submission.

### *JUDGMENT*

IT IS SO ORDERED, ADJUDGED, AND DECREED.